Filed 2/7/22  P. v. Bailey CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DEMETRIUS FRANK BAILEY, JR.,<br><br>    Defendant and Appellant. | F079127<br><br>(Super. Ct. No. BF164658A)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  John R. Brownlee, Judge.

Derek K. Kowata, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill and Nirav K. Desai, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Just after midnight, on the morning of June 25, 2016, defendant Demetrius Frank Bailey, Jr., entered the house he shared with his girlfriend and fired four shots at his girlfriend's daughter and the daughter's boyfriend, wounding the boyfriend in the leg, hip, and abdomen. After threatening to shoot them if they reported the incident to police, defendant ordered the victims from the house and, as they walked down the street, again threatened them not to contact the police. A jury convicted defendant of attempted murder, criminal threats of great bodily harm (two counts), assault with a firearm (two counts), and dissuading a witness by force or threat (two counts). The trial court sentenced defendant to a total term of 302 years to life in prison pursuant to the "Three Strikes" law (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)).[1]

Defendant contends on appeal (1) the trial court erred in admitting out-of-court statements as past recollection recorded where the witness was unable to remember being interviewed so as to attest to the truth of her statements; (2) the evidence was insufficient to support a conviction for dissuading a witness by force (count 7); (3) his sentence of 302 years to life in prison violates the Eighth Amendment bar on cruel and unusual punishment; and (4) the trial court erred in calculating defendant's presentence custody credits by failing to include the time defendant was confined in the state hospital after his competency was restored.

The People argue that defendant forfeited his claim of error regarding the out-of-court statements by not previously objecting on the ground he now raises, admission of the statements was not error, and the error, if any, was harmless. The People further argue that the evidence is sufficient to support the verdict on count 7, defendant forfeited his sentencing claim by not objecting in the trial court, and the trial court correctly calculated the presentence custody credits.

---

[1] Statutory references are to the Penal Code unless otherwise noted.

2.

We affirm defendant's judgment but remand for the trial court to recalculate defendant's presentence custody credits.

## PROCEDURAL BACKGROUND

Defendant was originally charged by complaint on June 28, 2016. Prior to defendant's preliminary hearing, on August 17, 2016, defense counsel raised a doubt as to defendant's competency pursuant to section 1368. The trial court found defendant incompetent to stand trial and committed him to the State Department of State Hospitals on November 15, 2016. After the trial court found defendant competent to stand trial on April 20, 2017, proceedings were reinstated, and defendant was held to answer after his preliminary hearing on May 3, 2017. The Kern County District Attorney filed an information on May 4, 2017. Defendant pled not guilty to all charges and denied all allegations alleged in the information on May 24, 2017.

During a motions in limine hearing on August 8, 2017, an amended information was filed charging defendant with attempted murder of Denzel[2] with premeditation and deliberation within the meaning of section 189 (§§ 664, 187, subd. (a); count 1), criminal threats against Denzel and Doneisha (§ 422; counts 2, 3, respectively), assault with a firearm as to Denzel and Doneisha (§ 245, subd. (a)(2); counts 4, 5, respectively), and dissuading a witness by force or threats of force as to Doneisha and Denzel (§ 136.1, subd. (c)(1); counts 6, 7, respectively). The amended information also alleged defendant personally and intentionally discharged a firearm causing great bodily injury during an attempted murder (§ 12022.53, subds. (c), (d); count 1), personally inflicted great bodily injury (§ 12022.7; counts 1, 2, 4), and personally used a firearm (§ 12022.53, subd. (b); count 7).[3] As to all counts, the amended information alleged defendant personally used a

---

[2] We refer to victims by their first names pursuant to California Rules of Court, rule 8.90 and to some parties by their first names for clarity and convenience because they share a last name. No disrespect is intended.

[3] The trial court granted the prosecutor's motion to dismiss this enhancement as it is not applicable to section 136.1, subd. (c)(1).

firearm (§ 12022.5, subd. (a)), four prior "strike" convictions within the meaning of the Three Strikes law (§§ 667, subds. (c)–(j), 1170.12, subds. (a)–(e)), three prior serious felony convictions (§ 667, subd. (a)), and seven prior prison terms (§ 667.5, subd. (b)).

Defendant's trial ended in a mistrial on August 23, 2017, after the jury received information that was not in evidence.

After a second eight-day trial, the jury convicted defendant of all counts on October 26, 2018. As to count 1, the jury also found true that defendant committed attempted murder with deliberation and premeditation (§ 189), personally and intentionally discharged a firearm during the attempted murder (§ 12022.53, subd. (c)), personally discharged a firearm causing great bodily injury (§ 12022.53, subd. (d)), and personally inflicted great bodily injury (§ 12022.7).[4] The jury also found true that defendant personally used a firearm in committing the offenses charged in counts 2 through 7 (§ 12022.5, subd. (a)) and personally inflicted great bodily injury as to Denzel in committing the assault charged in count 4 (§ 12022.7).[5]

Defendant waived his right to a jury trial regarding his prior convictions. The trial court granted the prosecutor's motion to dismiss defendant's section 667.5, subdivision (b) prior prison sentence enhancements. The trial court found true the allegations that defendant had been convicted of four prior "strike" offenses within the meaning of the Three Strikes law and that defendant had been convicted of three prior serious felonies within the meaning of section 667, subdivision (a). Prior to sentencing, the prosecutor notified the trial court that one of the convictions relied upon as both a

---

[4]     The amended information also alleged that defendant personally used a firearm (§ 12022.5, subd. (a)) as to count 1, but the trial court did not instruct the jury that this enhancement applied to count 1, and the record does not indicate the reason. The verdict form listed the enhancement after count 1, following the verdict forms for a lesser included offense, but the jury left it blank.

[5]     The trial court granted the prosecutor's motion to dismiss the section 12022.7 enhancement as to count 2 and the section 12022.53, subd. (b) enhancement as to count 7.

4.

"strike" and prior serious felony conviction was actually a misdemeanor and moved to strike the two enhancement allegations as to that conviction. On March 19, 2019, the trial court directed the probation officer to prepare an updated report and continued the sentencing hearing.

On April 9, 2019, the trial court heard defendant's motion for a new trial and sentenced him. The trial court denied defendant's motion for new trial and his motion to dismiss his prior convictions under the Three Strikes law pursuant to section 1385 and *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 504.[6] As to count 1, the court sentenced defendant to a term of 42 years to life, plus 25 years (§ 12022.53, subd. (d)), and stayed the remaining enhancements (§§ 12022.53, subd. (c), 12022.7) pursuant to California Rules of Court, rule 4.447(b). As to counts 2, 3, 5, 6, and 7, the court sentenced defendant to terms of 25 years to life, plus 10 years on each count for personally using a firearm (§ 12022.5, subd. (a)). For each count, the court increased the sentence by 10 years (five years for each of defendant's two section 667.5, subdivision (a) prior serious felony convictions). The court imposed and stayed a 27 year-to-life sentence and two 10-year enhancement terms as to count 4 (§§ 667.5, subd. (a), 12022.5, subd. (a)) pursuant to section 654.

Defendant was sentenced to total term of 302 years to life in prison, plus a $300 restitution fine (§ 1202.4, subd. (b)), a stayed $300 parole revocation fine (§ 1202.45, subd. (a)), victim restitution (§ 1202.4, subd. (f)(2)),[7] court operations assessments totaling $280 (§ 1465.8), and criminal conviction assessments totaling $210 (Gov. Code, § 70373). The court credited defendant with 1,166 days for time in custody, comprised of 1,019 days of actual custody credit and 147 days of conduct credit.

---

[6] The trial court did not formally strike the true finding as to the conviction that was, in actuality, a misdemeanor offense, but did not use that conviction to enhance defendant's sentence.

[7] The court ordered probation to determine the amount of restitution and that it be paid to the confidential victim and to the Restitution Fund in the State Treasury.

This timely appeal followed on April 10, 2019.

## FACTS

### I.     *The People's case.*

#### A.     Doneisha

Doneisha first met defendant in approximately September 2015, when defendant and Doneisha's mother, Volonda, visited Doneisha while she was incarcerated for a crime involving moral turpitude. Doneisha next saw defendant when defendant and Volonda picked her up from prison after her release on June 8, 2016. Defendant had been living with Volonda for some time. Doneisha had problems with defendant because he failed to return Volonda's car on time when Volonda permitted him to use it.

Doneisha stayed with Volonda the night she was released from prison and with a friend for serval nights thereafter. Doneisha returned to Volonda's house and stayed in the guest bedroom located across from the primary bedroom shared by defendant and Volonda. On cross-examination, Doneisha admitted that she previously testified to staying with Volonda between June 23 and June 25, 2016, but later testified that she arrived the night of June 20, 2016.

According to Doneisha, when she moved in with Volonda in late June 2016, defendant was not staying at Volonda's house. Doneisha's boyfriend of two years, Denzel, occasionally stayed with Doneisha in Volonda's house toward the end of June 2016. Her contact with Denzel violated the terms of her parole, and she did not report it to her parole officer.

On June 23, 2016, Doneisha drove Volonda to San Joaquin Hospital (the hospital) where it was determined that Volonda had suffered two strokes. Approximately two hours after arriving at the hospital, defendant arrived to visit Volonda. Doneisha saw defendant in the parking lot before he went to Volonda's hospital room and argued with him because she did not feel that defendant was being attentive enough to Volonda. In addition, Doneisha needed to borrow Volonda's vehicle at a certain time and defendant

6.

was ignoring her calls. Doneisha called defendant an inconsiderate "asshole." Once defendant arrived at Volonda's hospital room, defendant and Volonda argued because Volonda wanted to lend her car to Doneisha. Defendant grabbed Volonda's keys from her purse and refused to give them to Doneisha.[8] According to Doneisha, the nurse escorted defendant from the room and defendant took the keys with him. Volonda asked Denzel, who was also present, to retrieve them, and Doneisha followed Denzel downstairs to the parking lot.

Upon reaching the parking lot, Doneisha heard Denzel ask defendant for Volonda's keys. Defendant refused and moved as if to hit Denzel. Denzel responded that he only wanted the keys and did not want to fight. Defendant again moved as if he intended to hit Denzel, and Denzel punched defendant. Defendant fell back against a car and dropped the keys. Denzel picked up the keys as defendant told him, " 'I'm gonna kill you ….' "[9] Doneisha and Denzel returned to Volonda's hospital room and told her what had occurred. A few minutes later, Doneisha and Denzel walked out to Volonda's car and saw defendant standing near it. Denzel tried to shake defendant's hand, but defendant refused and said, " 'I'm gonna kill you.' " At the time, Doneisha noticed the smell of alcohol, observed broken glass by the car, and smelled beer near the gas tank. Doneisha and Denzel later drove Volonda's vehicle to Volonda's house and spent the night.

The following day, June 24, 2016, Doneisha missed a phone call from defendant. When she returned the call, defendant denied that he had called. Later in the day, Doneisha answered her cell phone and heard defendant talking to another man. Defendant did not appear to realize that he had called Doneisha. She heard defendant say

---

[8]     Doneisha had not previously described that Volonda and defendant struggled over Volonda's purse or that defendant forcefully took the purse from Volonda and removed the keys.

[9]     During cross-examination, Doneisha elaborated that defendant said, " 'I'm gonna kill you, … and I put that on my momma, and she'll suck your dick, and she in the dirt.' "

7.

that he needed a gun and the other individual respond, " 'Man, you don't need no gun. You need to calm down.' " Later that night, Doneisha listened to a lengthy voicemail left by defendant. The voicemail was played for the jury and defendant again appeared to be talking to someone else and unaware that he had called Doneisha. Defendant appeared to be discussing his relationship with Doneisha and Volonda, although many words were not intelligible. Defendant referred to Doneisha as "your daughter" and "bitch" and seemed upset that Doneisha was "get[ing] in[to] [his] business."

Earlier that day, Doneisha had used Volonda's vehicle to drive to the hospital and visit Volonda. She and Denzel returned to Volonda's house before midnight. Doneisha noticed defendant's clothing in the guest bedroom, but the clothes had not been there previously. Doneisha and Denzel checked the house and determined that no one else was present. However, she noticed that the bed in the primary bedroom was pulled two and a half feet away from the wall under the window, and the screws that lock that window were loose. Although she did not push the bed back against the wall, photographs taken after the incident show the bed flush against the wall.

Doneisha and Denzel started a load of laundry after checking the house. Doneisha texted her sister that she was doing laundry. After switching laundry loads, she fell asleep with Denzel next to her watching television. Doneisha identified photographs of her cell phone, testified to her cell phone number, and identified her cell phone as that used to text her sister that she was doing laundry.

After midnight, on the morning of June 25, 2016, Doneisha awoke hearing a loud boom and defendant's voice. She could not recall exactly what he said until reviewing her prior testimony. Defendant said, " 'I know you motherfuckers are in here.' " Doneisha testified that she previously told police that defendant crashed in the front door because she heard a loud noise and it did not sound as if defendant had used a key. Denzel opened the door to the hallway and stepped out. Doneisha followed and put her head into the hallway while standing in the doorway. She saw defendant down the

8.

hallway and watched as he held up a small revolver, pointed it toward Denzel's head, and fired it. Doneisha heard the shot and saw a hole in the cabinet at the end of the hallway behind Denzel, right above his head.[10] Denzel pushed her back into the guest bedroom, closed the door, and used his body to brace the door while unsuccessfully grabbing for a knife from the block of kitchen knives he had put in the room earlier for protection.[11]

Defendant banged on the door as Denzel told Doneisha to call the police. Doneisha called 911, provided the operator her name and address, and advised the operator that someone was in the house with a gun. Defendant yelled at Doneisha to hang up the phone or he would shoot her and Denzel. After reviewing prior testimony, Doneisha recalled that defendant specifically said, " 'Bitch, hang up the phone. You call the police, I'm gonna kill you and I'm gonna kill him too.' " Doneisha ended the call, scared that defendant would shoot them.

Doneisha testified that Denzel then opened the door and charged defendant, wrapping his arms around defendant and pushing him back into the primary bedroom across the hallway from the guest bedroom. Both men crashed into the bed wrestling for the gun. Doneisha could not see the men after they entered the primary bedroom, but she heard a shot, heard Denzel groan, and then heard another shot. Pulling on clothes, Doneisha went into the primary bedroom and saw Denzel sitting on the floor, bleeding from his legs.

When Doneisha entered the primary bedroom, defendant was at the end of the hallway. Doneisha picked up Denzel and helped him walk into the hallway. Defendant, still holding the gun, said, " 'You all thought I was playing, huh?' " and then, " 'Now you and your nigga better get the fuck out.' " Doneisha asked defendant for permission to

---

**10**      On cross-examination, defense counsel impeached Doneisha with her to statement to police that she did not see the gun initially and that Denzel told her that defendant had a gun.

**11**      Doneisha testified on redirect examination that Denzel brought the knives into the guest bedroom because Volonda called her the night before the incident and warned her to be careful because defendant "was talking stupid."

retrieve personal items and helped Denzel walk out of the house. Doneisha and Denzel headed for Volonda's car. Defendant demanded that Doneisha give him the car key as he was putting the gun into his pocket. Doneisha threw Volonda's key (acquired by Denzel from defendant on June 23, 2016) at defendant. When shown a photograph of a set of keys on a table in Volonda's hallway, Doneisha did not recognize the set of keys but was able to identify the key to Volonda's vehicle that she had turned over to defendant. Doneisha testified that Volonda only possessed a single key for the vehicle.

Doneisha testified that defendant had put the gun into his pocket as Denzel and Doneisha walked down the driveway, but reached for it as he said, " 'Now apologize. Say I'm sorry, …. Say I'm sorry.' " After reviewing prior testimony, Doneisha then testified that defendant was holding the gun when he told Denzel to apologize. Denzel apologized to defendant. Defendant told Doneisha that he intended to tell the police that there was a burglar in his house and that he shot the burglar because he did not know who it was.

Doneisha and Denzel walked down the street and she tried to call the police again. She provided her name and advised the operator that she had just called with her address and was now walking down her block. Defendant approached on a bicycle and she ended the call. He said something like, " 'I knew you would call the police.' " She denied using her cell phone. After defendant left, Doneisha and Denzel walked to a neighbor's residence around the corner from Volonda's house, and the neighbor assisted by allowing them into the house while Doneisha called 911 again.

Doneisha's last call to 911 was admitted into evidence and played for the jury. Doneisha advised the operator that she was at the neighbor's residence. When asked if she called previously, Doneisha responded, "I've been calling but I keep happen [*sic*] to hang up because this guy's chasing us down the street and he told me if I called the police …." Doneisha testified that defendant said he would shoot her and Denzel if they called the police. During the 911 call, after identifying and describing defendant,

10.

Doneisha said, "I tried to walk and get help because he keeps following us. [¶] … [¶] … Well he's been riding around on his bike saying that he was going to shoot if I called the police .…"

Doneisha was interviewed by an officer while at the neighbor's residence. A second officer later interviewed Doneisha at the police station. Before going to the station, Doneisha called Volonda and told her about the shooting. Later that morning, two detectives drove Doneisha to the hospital and interviewed Volonda.

Doneisha authenticated a video of Volonda's house, recorded June 25, 2016. She identified a bicycle located in the living room as that used by defendant that morning. Doneisha explained the events with reference to the video, indicating where she was located as the incident progressed. She identified the bullet hole in the hallway cabinet and the blood located in the primary bedroom where she found Denzel after he had been shot.

## B.    Doneisha's Interview with Officer Moore[12]

Officer Christopher Moore responded to the neighbor's residence and met with Doneisha. She had been crying and was upset and while Denzel was loaded into the ambulance. Officer Moore interviewed Doneisha and recorded the interview.

Upon defense counsel's motion, the trial court admitted the interview into evidence, and the audio was played for the jury. Doneisha first told the officers, "They didn't even fight. We were laying down. And he busted the door and he shot the gun once so Densel [*sic*] tried to wrestle him and get the gun from him because he knew he had a gun. And then he let off the other three shots." Doneisha told Officer Moore that

---

[12]    Because Doneisha's statements were admitted as prior statements, we may consider them for their truth and will set forth their contents individually. (See Evid. Code, §§ 1235, 1236; CALCRIM No. 318.)

11.

she was not familiar with firearms but described the gun as small and fitting into defendant's pocket.[13]

Doneisha told Officer Moore that she called 911 from inside the house after hearing the shot but had to end the call because she feared defendant would shoot again. Doneisha called the police again while walking down the street. Defendant rode a bicycle up to Doneisha and Denzel and said, " '[Y]eah we gonna see—we gonna see who gonna be the real snitch—let's see if these police show up—you wanna fucken call the police.' " Doneisha assured defendant that she did not call the police and begged him not to shoot again. Doneisha and Denzel went to a neighbor's house, and Doneisha called the police once more.

Doneisha told Officer Moore that on June 24, 2016, Volonda told defendant not to go to her house and instructed Doneisha to change the locks the following morning. Doneisha explained she and Denzel were the only people in Volonda's house, they were doing laundry, and she had fallen asleep. Doneisha told Officer Moore she had been staying at Volonda's house for two or three days, caring for Volonda, who had been sick, and using Volonda's car since being paroled.

After a break in the interview, Doneisha told Officer Moore that she awoke on June 25, 2016, after 12:25 a.m. when she heard defendant bang on the door and yell, " 'I know you mother fuckers are in there.' " He also yelled, " 'What you thought I was fuckin' playin' wit' you?' " Doneisha said that Denzel stepped into the hallway while she tried to dress. As Doneisha picked up her cell phone to call the police, she heard defendant say, " 'If you call the fuckin' police I'm gonna kill his ass. I'm gonna kill his ass.' " When Denzel stepped into the hallway, he asked, " 'Uh, like what's up man,' " and defendant replied, " 'Ain't no fuckin' what's up,' " and she heard the first gun shot. Denzel was not hit by the first shot. Later in the interview, Doneisha said she was behind

---

[13]    While interviewing Doneisha, Officer Moore mentioned that Denzel described the firearm as a revolver.

Denzel when he stepped into the hallway. Denzel pushed defendant across the hallway into the primary bedroom, and they wrestled for the gun. Doneisha heard two more shots. Denzel fell to the floor, groaning. Defendant walked down the hallway ordering them to " 'get the fuck out.' " Doneisha told Officer Moore that defendant threatened her again while she was on the phone with the police and she ended the call, grabbed her backpack and slipped into her pants.

Defendant repeatedly ordered Doneisha and Denzel to leave the house, and Doneisha struggled to help Denzel walk outside. Defendant was standing in the front yard with the gun. Doneisha begged defendant not to shoot again, and defendant put the gun into his pocket. At some point, defendant ordered Denzel to apologize and let Denzel and Doneisha leave after Denzel said he was sorry.

Defendant initially followed them a short way on foot, but then left and returned on a bicycle. Doneisha explained, "And I had already called [911] again. [¶] … [¶] … And so when he pulled up he was like,—when I seen him on the bike I hurried up and hung up the phone again. [¶] … [¶] … And so he pulled up and he said, 'We're gonna see if you gonna be a snitch.' " Defendant also said, " 'We gonna see if you called the fuckin' police,' " and " 'I bet you fucking called the police, bitch.' " Doneisha denied calling the police and begged him to leave. She feared that defendant would shoot them. After defendant rode away on the bicycle, Doneisha directed Denzel to a street where defendant could not see them and called the police again as she and Denzel asked for help at a neighbor's house.

When asked more specifically about the bicycle, Doneisha explained that defendant usually rides a white bike stored in the guest bedroom, but the bicycle was not there when she and Denzel returned to Volonda's house on June 24, 2016. Upon returning, they thought defendant had been in the house because his clothes were on their bed in the guest bedroom, windows were left open, and all the lights were on. Doneisha noticed that the primary bedroom window was unlocked. Doneisha said that Volonda

13.

previously told defendant that she would deliver his belongings, but defendant replied that he would get his own things. Doneisha thought defendant entered the house through the primary bedroom window to retrieve his belongings as she had the house key.

Officer Moore asked Doneisha if she knew defendant had a gun before that evening. Doneisha said that earlier in the day on June 24, 2016, defendant had accidentally called her cell phone and she heard him talking to someone. She heard defendant say, " 'I need that gun you don't understand this is my life.' " She heard the other individual tell defendant, " 'I'm not giving you know [*sic*] damn gun.' " She heard defendant reply, " 'I don't give a fuck it's my house and I need that gun.' " Doneisha ended the call and told Volonda about it. Doneisha then received a long voicemail from defendant who, again, was conversing with someone else after accidentally calling Doneisha. Doneisha showed her cell phone to Officer Moore, and Officer Moore noted when defendant called and defendant's cell phone number. Doneisha said that during the recording, defendant told another individual that he was not going to let Doneisha and Denzel intrude on Volonda's house as he paid the bills. Defendant's references to "her daughter" during the recording caused Doneisha to believe defendant was referring to her during the conversation.

During her interview, Doneisha played defendant's voicemail, received June 24, 2016, at 9:06 p.m., and it was recorded as part of her interview with Officer Moore. Much of the recording was unintelligible, but defendant mentioned Volonda, her "daughter," paying bills, and "our house." Doneisha identified defendant's voice on the voicemail and explained that she first met defendant when he visited her while in prison and then again when she paroled.

### C.    Doneisha's Interview with Detectives Vaughn and Feola

Detectives Ryan Vaughn and Christopher Feola interviewed Doneisha on June 25, 2016, at 5:35 a.m. Doneisha told the detectives that her mother, Volonda, lived alone since she had asked defendant to leave the house a few days before. When asked about

14.

Volonda's vehicle, Doneisha responded that defendant demanded Volonda's keys to the vehicle earlier that morning, and Doneisha threw them at him so defendant would not shoot her.

Doneisha explained to the detectives the events of the prior few days. Volonda went to the hospital on June 23, 2016. Defendant left the hospital several times, and Doneisha told him to stay with Volonda. They went to Volonda's hospital room. Doneisha was upset because she needed Volonda's car for a parole class, and defendant had not returned the car on time. Defendant told Volonda that he did not care that he was late and refused to let Doneisha "invade his house." Volonda asked defendant why he returned the car late and told defendant, " 'Just get your shit out of my house.' " Defendant said he did not want to leave the hospital, and Volonda asked for her keys back. After loud arguing, the nurse asked defendant to leave, and defendant left with the keys. Volonda asked Denzel to retrieve her keys. Doneisha followed and joined defendant and Denzel in the parking lot.

Defendant objected to Doneisha treating him with attitude and told Doneisha he sent the packages that she received in prison, not Volonda. Doneisha told defendant that she believed he should have been staying with Volonda in the hospital. Denzel asked for Volonda's keys, but defendant refused to give him the keys. Defendant "squared off with Denzel, and he just like kept punching at him." Doneisha turned away for a minute and then saw defendant throw a missed punch, and Denzel punched defendant back. Defendant fell back against a car, dropping the keys. Denzel picked them up. Doneisha and Denzel returned to Volonda's hospital room.

A few hours later, Doneisha and Denzel went back to the parking lot and saw defendant sitting on the car. After exchanging more words with defendant, Doneisha and Denzel returned to Volonda's hospital room. At some point during their earlier confrontation, defendant told Denzel that he had " 'fucked with the wrong one' " and said, " 'I'm gonna kill you.' "

15.

The next day, on June 24, 2016, Doneisha received several cell phone calls wherein she could hear defendant talking to someone in the background, although defendant did not talk to her. She put one of the calls on speaker so Denzel could hear. Defendant told the other man that he needed to find a gun for defendant. The other individual tried to convince defendant that he did not need a gun, but defendant insisted that he needed it and it was his life. Doneisha told Volonda who tried to call defendant. Later, Doneisha noticed a voicemail from defendant, which was a recording of defendant talking to someone else. Volonda then called defendant, told him not to disrespect Doneisha, and instructed him to stay away from Volonda's house. Defendant told her he would retrieve his own belongings and said something that caused Volonda to ask defendant if he had made a threat.

Doneisha and Denzel left the hospital at approximately 11:00 p.m. Upon arriving at Volonda's house, they noticed the lights were on and defendant's dirty clothes were on their bed. They checked the entire house and found the primary bedroom window was unsecured and the bed pushed away from the wall under the window.

After starting laundry, Doneisha fell asleep at approximately 12:25 a.m. on June 25, 2016. She awoke when she heard defendant banging on the door. Defendant yelled, " 'I know you mother fuckers are in here.' " Doneisha said she and Denzel "heard the front door crash in," and they "saw [defendant] in the hallway," and she guessed Denzel "saw the gun before [she] did." She explained that she stood in the doorway of the guest bedroom and saw defendant reach into his pocket. Denzel closed the door to the guest bedroom, leaned against the door, and yelled for Doneisha to call the police because defendant had a gun. Defendant pushed on the door and said, " 'If you call the police, bitch, I'm gonna kill you, and I'm gonna shoot him, too.' " Doneisha ended the call as defendant pushed open the guest bedroom door. Denzel reached for a knife but did not get one. Defendant fired a shot, and Denzel charged him, pushing him into the primary

bedroom across the hallway as they wrestled for the gun. Defendant fired the gun three more times, and Doneisha heard Denzel groan.

Defendant walked down the hallway and ordered them to leave the house. Doneisha put on her clothes and grabbed her cell phone and backpack. Defendant ordered them to get out of the house and said, " 'I'm gonna kill you.' " Defendant still had the gun in his hand as he watched them leave the house. He put the gun into his pocket and ordered Doneisha to give him the keys. She threw the keys to defendant and started walking down the driveway.

Defendant then reached for the gun. Doneisha turned around and begged him not to shoot. Defendant said he would kill them and that they thought he " 'was playin'.' " Defendant ordered Denzel to apologize, and Denzel said he was sorry. As they walked away, Doneisha called 911. The operator asked if Doneisha had just called and hung up. Doneisha explained, " 'Well this man is telling me he's gonna kill me if I call the police. Like I have to hang up. Like he can't see me on my phone.' " Almost halfway down the block, Doneisha saw defendant riding a bicycle toward them. He accused her of calling the police and " 'snitchin'.' " He said, " 'Yeah, we gonna see now. We gonna see who the snitch, bitch. You snitchin'? You callin' the fuckin' police? All right. We gonna see.' " Doneisha assured him that she did not call the police, and defendant rode back down the street.

Doneisha said that the firearm was silver and had a spinner for the bullets. She heard four gunshots total. After Denzel was shot, Doneisha stepped into the hallway while trying to help Denzel off the floor. Defendant pointed the gun at both of them, told Denzel to get up or defendant would shoot Denzel again, and then told both of them to get out of the house. Doneisha was afraid that defendant would shoot them. Doneisha stated, "Um, [defendant] told me that if I didn't hurry—if I called the police he was gonna kill me. He said, 'If you call the police, bitch, I'm gonna—I'm gonna kill you, and I'm gonna shoot him again.' " Doneisha believed him.

17.

Detective Vaughn asked Doneisha if she was certain defendant had not been in Volonda's house when they arrived. Doneisha said that she and Denzel had checked, and no one was home. She added that defendant told her, " 'You wanna come in my house. I'm gonna tell the police you was a fuckin' burglar. I didn't know who you was.' That's what he said to [her]." Detective Vaughn asked Doneisha about the knives. Doneisha said that Denzel put the knives in the guest bedroom after Volonda relayed that defendant threatened to shoot and kill Denzel during a phone conversation. Volonda told Doneisha defendant was very upset and Doneisha and Denzel should be careful. Doneisha said defendant did not have a key to the house. Detective Feola pointed out that the door was not damaged.

The detectives asked additional questions, reviewing information Doneisha previously provided. Doneisha said that she and Denzel looked out the guest bedroom door, then walked into the hallway and saw defendant in the hallway. Denzel ran into the hallway, ran back into the guest bedroom, and told Doneisha that defendant had a gun, but she had not seen it yet. Denzel attempted to keep the door closed as defendant tried to get into the room. Doneisha ended the call before Denzel opened the door and ran at defendant. She heard the first shot at that time but did not see if it hit anything or where the shot was directed; three more shots followed. Defendant walked from the primary bedroom, leaving Denzel on the floor bleeding.

Defendant pointed the gun at them and threatened to kill them if they did not leave the house. Doneisha and Denzel walked out the front door, past defendant, who still had the gun in his hand. Defendant then demanded Doneisha's keys and said he would tell the police that they were burglars and that he had not recognized them. At the end of the driveway, Doneisha shielded Denzel when defendant appeared to be reaching for his gun. She begged defendant not to shoot, and defendant demanded that Denzel apologize. Denzel apologized, and they managed to walk down the street past three houses before

defendant caught up to them on a bicycle. Defendant accused Doneisha of calling the police and then said, "We'll see what's up."

In response to questioning, Doneisha explained that she had been staying at Volonda's house for the past three days. Doneisha turned her cell phone over to the detectives so they could download the information pertaining to the voicemail and calls from defendant.

### D. Volonda

Volonda testified that she had been dating defendant eight or nine months as of June 2016. They lived together at her house and shared the primary bedroom. Doneisha, her daughter, stayed with Volonda after Doneisha was released from custody in June 2016. Volonda and defendant picked Doneisha up when she was released from custody. Denzel was Doneisha's boyfriend and sometimes slept at Volonda's house.

Volonda began having medical issues in June 2016. After Volonda passed out at work, Doneisha took Volonda to the hospital. Defendant visited Volonda in the hospital, and she asked him to return her keys. Defendant left without returning them, and Denzel and Doneisha followed defendant out to retrieve the keys at Volonda's request.

Volonda suffered from memory loss because of her medical issues and did not remember leaving the hospital and several months thereafter. Volonda did not remember that detectives interviewed her regarding the shooting the day it happened while she was in the hospital. Upon hearing a recording of her interview with detectives after the shooting, Volonda recognized her voice but still did not recall the interview.

Statements from Volonda's interview were admitted into evidence as past recollection recorded under Evidence Code section 1237. When interviewed in June 2016, Volonda told the detectives that she had been dating defendant for one year as of June 9, 2016. She said she argued with defendant two days prior to the interview, when defendant refused to return her car key. Defendant took the keys when he left her hospital room, and Denzel followed at her request to retrieve them. Defendant called her

19.

later to say, " 'you know what—you just gave that boy a death wish.' " Defendant continued to "talk[ ] crap," so Volonda told him not to come to her house anymore and to "lose" her number.

During the interview, Volonda also described her key chain and keys and described defendant's key chain. She said that she only had one key to her vehicle and would take it off her chain to give to defendant when defendant borrowed the car. Volonda clarified that defendant had keys to her house because she had not kicked defendant out of the house until the evening before her interview while on the telephone. She told defendant not to come to her house or on her premises and that she hated having met defendant. Volonda said that Doneisha and Denzel had been staying at Volonda's house for a week with her permission.

During the second trial, defense counsel questioned Volonda concerning her testimony at the first trial. At the first trial, Volonda testified that she could not remember going to the hospital or anything that happened while there. However, at the second trial, Volonda testified that she remembered some things that happened while in the hospital, and she did not believe that her memory was based on what people may have told her. She remembered Doneisha taking her to the hospital and being in her hospital room while Doneisha, Denzel, and defendant were present.

### E.     Dr. Victor Sorenson

Denzel was treated at Kern Medical Center by Dr. Victor Sorenson, who operated on him. Denzel had been shot in his right thigh, left hip, and the upper portion of his abdomen. Dr. Sorenson repaired two holes in Denzel's duodenum and removed his right kidney. Without surgery, Denzel would have bled to death.

### F.     Detective Daniel McClive

Detective Daniel McClive, employed by the Bakersfield Police Department, examined Doneisha's cell phone and produced a report of its contents. The phone's log showed a six-minute voicemail left by defendant's phone and a text message to

20.

Doneisha's sister that confirmed Doneisha told her sister she was doing laundry at 11:09 p.m. on June 24, 2016.

### G. Jennifer Castro

Jennifer Castro was at her parent's house when Doneisha and Denzel knocked on the living room window seeking help. Denzel had a gunshot wound to his abdomen and was bleeding. Denzel was afraid, panicked, and in pain. While awaiting the ambulance, Denzel expressed the belief that he was bleeding to death. He then told Castro that Doneisha's mother's boyfriend had shot him.

### H. Officer Eric Hardin

Officer Eric Hardin, employed by the Bakersfield Police Department, responded to Castro's residence and contacted Denzel. Denzel was wearing a white T-shirt and blue boxer briefs and bleeding profusely from wounds to his leg and abdomen. Denzel was in pain and having trouble speaking and breathing. Denzel said that he had been shot by "his girlfriend's mom's boyfriend," who used a small black revolver.

### I. Juanita Lee

Juanita Lee worked as a laboratory technician for the Bakersfield Police Department. Lee responded to Volonda's house, where the shooting occurred, and both videotaped and photographed the interior and exterior. In the main hallway, Lee photographed a set of keys.[14] The keys were found near a blue bicycle that was also in the hallway. In addition, Lee recorded and photographed the cabinet at the end of the hallway. Lee located holes from a bullet in the right cabinet door, a sneaker stored behind the cabinet door, and the wall behind the cabinet. Lee could not retrieve the bullet because although it had entered the wall behind the cabinet, it did not exit the wall. The bullet hole in the wall was approximately six feet and two inches above the hallway floor.

---

**14** Doneisha testified that these keys belonged to defendant and identified Volonda's car key on the key ring.

21.

Lee discovered no blood on the knives found in the guest bedroom, but did discover blood in the primary bedroom, the primary bedroom exterior door, the entryway, and near the exterior of the front door.

## II.     *The defense case.*

The defense rested without presenting any evidence.

## DISCUSSION

### I.     *The trial court did not err in admitting Volonda's statements to police as past recollection recorded.*

Defendant asserts the trial court prejudicially erred by admitting certain out-of-court statements from Volonda under the past recollection recorded exception to the hearsay rule. Defendant argues that Volonda failed to adequately attest to the reliability of her prior statements because she could not remember making the statements to the detectives. However, defendant did not make this objection to the trial court, arguing only that Volonda did not know she was being recorded and her anger with defendant gave her a motive to lie.

We agree with the People that defendant forfeited his argument that Volonda's statement failed to satisfy Evidence Code section 1237, subdivision (a)(3) when he did not oppose admission on that basis. But even if the argument has not been forfeited, we conclude the trial court did not abuse its discretion in admitting the statements and any error in doing so was harmless.

#### A.     Background

Prior to his first trial and again before his second trial, defendant orally moved to redact hearsay from any audio recordings of witnesses played for the jury.[15]  When the

---

[15]     The parties stipulated that the trial court's prior evidentiary rulings, including that as to admission of Volonda's prior recorded interview, would be applicable at the second trial.

22.

trial court asked defense counsel if he was referring to whether Volonda's statement qualified as prior recollection recorded, defense counsel responded:

> "It includes that, but every statement includes the modern rewardable police technique of offering their own opinions and structures about—or creations about how a person is guilty or, you know, praising the truthfulness or voracity [*sic*] of witnesses.

> "So it has to be done on a line-by-line basis. Simply if the—it's being offered for a prior inconsistent statement or prior consistent statement, it has to still be admissible under [Evidence Code section ]352, and over other proper evidentiary foundation objections.

> "So before any tape is played, I would like the opportunity to address with the Court line by line which components of that are admissible."

The trial court commented that it had listened to Volonda's interview and believed that Volonda's statements as to what defendant told her would be admissible, but that statements made by others to Volonda and the detective's statements would be inadmissible hearsay. Defense counsel argued that the statements were unreliable because Volonda did not know she was being recorded. The court agreed to conduct a hearing pursuant to Evidence Code section 402 to permit the prosecutor to lay a foundation for admission of the statement and instructed the prosecutor to submit a proposed redacted transcript. Upon receiving redacted transcripts from both parties, the trial court provided its own redacted transcript to the parties for discussion at a subsequent hearing.

The trial court heard evidence in accordance with section 402 of the Evidence Code on August 16, 2017, to determine the admissibility of Volonda's interview statements. Volonda testified that during June 2016, she had a stroke at work and was hospitalized for the following two and a half months. Volonda did not remember anything that happened during the one-week period she was initially hospitalized, not even actually being in the hospital. Her memory loss extended from her hospitalization

in June 2016, until August 2016. Volonda did not remember her argument with defendant concerning her car key or the interview with the detectives while she was hospitalized.

Volonda identified her voice from her interview with the detectives but did not remember being interviewed by them. Volonda remembered events in June 2016 that occurred prior to her hospitalization and confirmed that the following information she provided to the detectives was, in fact, true: (1) she and defendant picked up Doneisha when Doneisha was released from prison; (2) she permitted Doneisha to stay in her house; (3) her description of her keychain; (4) she possessed a single key for her vehicle and permitted defendant to use her vehicle, transferring the key from her key chain to his whenever he borrowed it; (5) defendant possessed a key to her house; (6) she allowed Doneisha and Denzel to sleep in the guest bedroom across from her own; (7) she did not have a firearm in her house but possessed a flare gun and taser; and (8) she never saw defendant or Denzel with a firearm.

Volonda did not remember the following information that she previously provided to the detectives: (1) the description of defendant's key chain; and (2) her conversations with defendant while she was in the hospital.[16] Volonda testified that she told the truth during the interview, but also acknowledged she could not say that the statements to the detectives were true regarding the matters she could no longer remember. However, Volonda also testified that she had no reason to believe that she would have lied to the detectives and that her other statements to the detectives were true.

By the time of the second trial, Volonda had recovered some memory of the events in the hospital, was able to recall the argument between defendant and herself

---

[16] Although not expressly discussed in the hearing, during her interview with the detectives, Volonda described her phone conversation with defendant wherein defendant told Volonda, " '[Y]ou just gave that boy a death wish.' "

24.

concerning the car key, and could remember asking Denzel to retrieve them from defendant.[17]

Detective Feola testified that he participated in the interview with Volonda and that the recording of the interview was accurate. Volonda did not know she was being recorded, nor did she direct that the recording be made. Volonda appeared to understand the questions she was asked and was alert.

The prosecutor requested the recording of Volonda's interview be admitted as past recollection recorded pursuant to section 1237 of the Evidence Code. The trial court asked the prosecutor to specifically address Evidence Code section 1237, subdivision (a)(3), which requires that the witness testify that the statement made be a true statement of the fact. The prosecutor argued that the court could admit the statements, even though Volonda did not remember making them or the information described in some of the statements, because she sufficiently recalled the truth of enough of them and testified that she had no reason to lie.

Defense counsel objected to admission of Volonda's interview because "it's using [the interview as] a device to get in what, under [Evidence Code section ]352, is extremely prejudicial evidence against my client, and she's not—she's not recording her own statement. She's recording what she claims someone said to her." Defense counsel argued, "I think that if you just skip ahead to a[n Evidence Code section ]352 analysis, the prejudice far outweighs any probative value." Defense counsel also objected to admission of statements from the interview concerning events that Volonda remembered.

---

[17] Defense counsel cross-examined Volonda as to whether she remembered what actually happened or what someone had told her had happened. Volonda was quite adamant that she remembered the events and was surprised that she could not remember them during the first trial. Since Volonda had sufficient memory of these events, the interview statements concerning them would not be admissible as past recollection recorded. (Evid. Code, § 1237, subd. (a).) However, given that defense counsel cross-examined Volonda and impeached her with prior testimony, statements from the interview would have been admissible in any event as prior consistent statements. (*Id.*, § 1236.)

25.

Defense counsel, although acknowledging there would be no confrontation issue, argued that defendant would be denied his right to effectively cross-examine Volonda about defendant's statements to Volonda because she had no memory of them. Finally, defense counsel argued that Volonda's interview statements were inherently untrustworthy because she was angry at defendant when she made them.

The trial court ruled that the requirements of section 1237 of the Evidence Code had been met and that the redacted recording could be played for the jury.[18]

## B.    Standard of Review and Law

"[A]n appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence, including one that turns on the hearsay nature of the evidence in question." (*People v. Waidla* (2000) 22 Cal.4th 690, 725.) "A trial court's exercise of discretion in admitting or excluding evidence is reviewable for abuse [citation] and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.) "The defendant bears the burden of showing a clear abuse of discretion by the trial court in admitting evidence." (*People v. Royal* (2019) 43 Cal.App.5th 121, 144; citing *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124–1125, abrogation on other grounds recognized by *People v. Leon* (2020) 8 Cal.4th 831; see *Denham v. Superior Court* (1970) 2 Cal.2d 557, 566.)

Hearsay evidence is evidence of an out-of-court statement offered to prove the truth of the matter asserted therein and is inadmissible unless it falls within an exception

---

[18]    The trial court initially expressed concern that Volonda's memory loss appeared contrived and that she was purposely evasive given that the court observed Volonda smiling at defendant during the course of her testimony. If so, the interview could be admitted as a prior inconsistent statement. (See Evid. Code, § 1236.) Ultimately, the trial court determined that it "[would] give [Volonda] the benefit of the doubt as to whether or not she's being purposely evasive."

to the hearsay rule.  (Evid. Code, § 1200.)  Evidence Code section 1237 provides an exception to the hearsay rule based on past recollections recorded and states in relevant part:

> "(a) Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement would have been admissible if made by him while testifying, the statement concerns a matter as to which the witness has insufficient present recollection to enable him to testify fully and accurately, and the statement is contained in a writing which:
>
>> "(1) Was made at a time when the fact recorded in the writing actually occurred or was fresh in the witness'[s] memory;
>>
>> "(2) Was made (i) by the witness himself or under his direction or (ii) by some other person for the purpose of recording the witness'[s] statement at the time it was made;
>>
>> "(3) Is offered after the witness testifies that the statement he made was a true statement of such fact; and
>>
>> "(4) Is offered after the writing is authenticated as an accurate record of the statement."  (Evid. Code, § 1237, subd. (a).)

" ' "[W]hether an adequate foundation for admission" of a statement under Evidence Code section 1237 has been established turns on whether the declarant's "testimony that [the] statement was true was reliable," and the trial court who hears the declarant's testimony has "the best opportunity" to assess its credibility.' "  (*People v. Sanchez* (2019) 7 Cal.5th 14, 41, first bracketed insertion added.)

" 'A general objection to the admission or exclusion of evidence, or one based on a different ground from that advanced at trial, does not preserve the claim for appeal.' "  (*People v. Jackson* (2016) 1 Cal.5th 269, 366; see *People v. Cowan* (2010) 50 Cal.4th 401, 465–466 (*Cowan*).)

27.

### C.    Analysis

#### 1.    *Defendant forfeited this objection by not raising it below.*

Defendant's specific claim on appeal is that the trial court erred by admitting Volonda's recorded statement under Evidence Code section 1237 "because she had no recollection of making the statement or having the conversation with [Detectives] Feola and Vaughan [*sic*] at the hospital in which the statement was made." Defendant did not raise this objection in the trial court. While defense counsel made several objections to Volonda's interview recordings, none of them can be understood as a challenge to the requirement that the witness testify that her statement was true. (See Evid. Code, § 1237, subd. (a)(3).)

For example, defense counsel's objection that hearsay should be redacted from Volonda's interview recording applies to the requirement that the statements must be admissible as if the witness was testifying. (See Evid. Code, § 1237, subd. (a).) Defense counsel's objection that Volonda did not know she was being recorded relates to the requirement that the recording be made by the witness, at her direction, or by some other person at the time of her statement. (See *id.*, subd. (a)(2).) Defense counsel also argued that Volonda did not record her own statements and that her statements included defendant's statement to her—referring both to the requirement that Volonda have recorded her statement and that her statement included hearsay that would not be admissible if she testified. (See *ibid.*) Defense counsel additionally objected that the evidence was more prejudicial than probative (see Evid. Code, § 352), denied defendant's right to effectively cross-examine Volonda, and that the statements were inherently untrustworthy because she was angry at defendant when she made them. These objections do not pertain to Evidence Code section 1237.

Evidence Code section 353, subdivision (a) provides in relevant part, that a judgment will not be reversed because of the erroneous admission of evidence unless "[t]here appears of record an objection to or a motion to exclude or to strike the evidence

that was timely made and so stated as to make clear the specific ground of the objection or motion." In *Cowan*, reviewing Evidence Code section 1237 specifically, the California Supreme Court found that Cowan forfeited his objection to a writing pursuant to Evidence Code section 1237, subdivision (a)(1) on appeal by only objecting pursuant Evidence Code section 1237, subdivision (a)(3) in the trial court. (*Cowan*, *supra*, 50 Cal.4th at pp. 465–466.) Cowan argued on appeal that a recorded statement was inadmissible as a past recollection recorded because the police interview during which the statement was recorded took place more than three months after the events described and, thus, the statements were not fresh. (*Id.* at p. 465.) At trial, Cowan argued that the witness failed to reliably vouch for the truthfulness of his statement as Evidence Code section 1237, subdivision (a)(3) requires. (*Cowan*, at p. 466.) Citing Evidence Code section 353, the Supreme Court held that Cowan could not raise that argument for the first time on appeal. (*Cowan*, at pp. 465–466.)

Though defense counsel objected to admission of Volonda's interview on several grounds, he failed to object on the ground raised in defendant's appeal. Even when the trial court specifically asked defense counsel to address Evidence Code section 1237, subdivision (a)(3), defense counsel failed to object to admission on that basis or respond to the prosecutor's argument as to that subdivision. Defense counsel did not object to Volonda's interview statements being admitted on this basis. For these reasons, we conclude defendant has forfeited the issue.

However, even if not forfeited, we conclude the trial court did not abuse its discretion in admitting the prior interview and find the error, if any, harmless.

### 2. Volonda adequately attested to the truth of her statements to support admission as past recollection recorded.

Evidence Code section 1237, subdivision (a)(3) permits past recollection recorded to be admitted if "the witness testifies that the statement he [or she] made was a true statement of such fact." Volonda testified that she did not remember the hospital

29.

incidents involving defendant, including a phone conversation where defendant said, " '[Y]ou just gave that boy a death wish.' "  Volonda also testified that she could not remember all the events she discussed in the interview and that she could not remember being interviewed by the detectives but believed her statements to be true and that she had no reason to lie.  Regarding portions of the interview, Volonda could attest to the truth of some of what she told the police.  She also conceded to defense counsel that if she could not remember the occurrence, then she could not say that the individual statements were true.

Defendant argues that Volonda's testimony is not sufficient to satisfy Evidence Code section 1237, subdivision (a)(3), relying on *People v. Simmons* (1981) 123 Cal.App.3d 677 (*Simmons*).  In *Simmons*, the witness suffered a head injury causing amnesia after making the statement in question.  (*Id*. at p. 679, abrogation recognized by *Cowan*, *supra*, 50 Cal.4th at p. 468.)  At trial, the witness could not remember making the statement or the facts described therein.  (*Ibid*.)  He testified that he had no reason not to tell the truth.  (*Ibid*.)  The Court of Appeal held that Evidence Code section 1237 was meant to be a narrow hearsay exception where the trustworthiness of such statements is attested to by the maker and subject to the test of cross-examination, a procedure not meaningfully available where the witness does not remember making the prior statement or the circumstances surrounding it.  (*Simmons*, at p. 682.)  *Simmons* concluded that one who has no knowledge as to the truth or falsity of a representation may not reliably testify as to its trustworthiness:

> "Therefore, when he states that to the best of his knowledge he had no reason to lie when the statement was prepared, it is clear he could have stated with equal conviction to the best of his (nonexistent) knowledge he had had ample reason to lie.  The fact is, he simply has no knowledge at all. One who has no knowledge as to the truth or falsity of a representation may honestly say it is either true or false to the best of his knowledge with neither rejoinder having any evidentiary value."  (*Simmons*, *supra*, 123 Cal.App.3d at pp. 682–683.)

30.

*Simmons* concluded that the maker could not be subject to cross-examination as to the trustworthiness of a prior statement as required by Evidence Code section 1237. (*Simmons*, at p. 683.) The court also found that "the indicia of reliability required to satisfy the confrontation clause, oath, cross-examination and an opportunity to examine demeanor, are completely lacking as to admissibility under [Evidence Code ]section 1237 as well …." (*Ibid*.)[19]

The California Supreme Court distinguished *Simmons* in *People v. Cummings* (1993) 4 Cal.4th 1233 (*Cummings*). In *Cummings*, the witness contacted a police detective while in county jail. (*Id*. at p. 1292, abrogation recognized by *People v. Merritt* (2017) 2 Cal.5th 819, 821–822.) The witness told the detective about several conversations with Cummings wherein Cummings discussed criminal activity. (*Ibid*.) At trial, however, the witness could not remember his conversations with either Cummings or the detective. (*Id*. at p. 1293.) He also testified that he had been undergoing detoxification and suffered delusions during the time he conversed with Cummings and the detective, and that he still suffered from drug-related problems at the time of trial. (*Ibid*.) The witness testified while he could not remember his conversations, he truthfully reported his conversation with Cummings to the detective. (*Ibid*.)

Cummings argued, based on *Simmons*, *supra*, 123 Cal.App.3d 677, that the foundation for admission required by Evidence Code section 1237 was inadequate because the witness could not remember his conversation with Cummings or his conversation with the detective. (*Cummings*, *supra*, 4 Cal.4th at p. 1294.) *Cummings*

---

[19] *Simmons* also relied upon the California Supreme Court's decision in *People v. Blair* (1979) 25 Cal.3d 640, 665–666 for the proposition that "[p]roof of the mere fact a witness is a neutral person without motive to falsify a statement is not sufficient to establish the trustworthiness foundation required under [Evidence Code ]section 1237." (*Simmons*, *supra*, 123 Cal.App.3d at p. 683.) However, *Blair* held that the neutrality of a witness was insufficient to establish reliability as to statements made under hypnosis where experts testified "that there is no way to determine if a person under hypnosis is relating actual facts." (*Blair*, at pp. 665–666.) Where the statement is made under circumstances that could cause a witness to fantasize, the neutrality of the witness does little to assure the reliability of the statement.

31.

held that the adequacy of the foundation for admission "turned on whether [the witness's] testimony that his statement was true was reliable." (*Id*. at p. 1294.) Cummings testified that the witness could not reliably testify that the statement was true because he did not remember the conversations. The Supreme Court distinguished *Simmons*: "There, the witness had amnesia and could not recall any of the events in his statement, making it, or any circumstances surrounding the statement. He testified only that he had no reason to lie when he made the statement." (*Cummings*, at p. 1294.) The witness in *Cummings* could describe where his conversation with defendant took place, even if not the content, and could recall that he spoke with police, even if not the content of his conversation. "The judge was aware that [the witness] had testified that he was delusional and did not know what the facts were, and had said that he did not recall, but, after extensive argument, admitted the evidence. We cannot conclude that she abused her discretion in doing so. She heard the testimony and had the best opportunity to assess the credibility of the witness. Her conclusion that [the witness] testified truthfully and reliably when he said that his statement to [the detective] was true is supported by the record." (*Ibid*.)

Defendant argues that Volonda's inability to remember making her statement to the detectives prevents her from reliably testifying that the statement was true, relying on *Simmons*. The People respond that *Simmons* is no longer good law after the Supreme Court's decision in *Cowan*.

In *Cowan*, the witness testified that he told the truth to the best of his ability in his statement to the detective, even though he had no memory of making the statement or the underlying events he described. (*Cowan*, *supra*, 50 Cal.4th at pp. 466, 465.) However, the witness also admitted that his memory at the time was " 'jumbled' " and " 'scrambled' " because of the drugs he had been taking, that he sometimes suffered from delusions, and that he may have lied as to a portion of the interview not used at trial. (*Id*. at pp. 466, 467.) Nonetheless, *Cowan* found no error. " '[W]hether an adequate foundation for admission' of a statement under Evidence Code section 1237 has been

32.

established turns on whether the declarant's 'testimony that [the] statement was true was reliable,' and the trial court who hears the declarant's testimony has 'the best opportunity' to assess its credibility." (*Id*. at p. 467, quoting *Cummings*, *supra*, 4 Cal.4th at pp. 1293–1294.)

*Simmons*'s interpretation of Evidence Code section 1237 was derived in substantial part from its conclusion that a witness's memory lapse precluded effective cross-examination (necessary for assessing trustworthiness as required by Evid. Code, § 1237) and violated the confrontation clause. (*Simmons*, *supra*, 123 Cal.App.3d at p. 683.) The California Supreme Court addressed the confrontation clause issue in *Cowan* and concluded that the United States Supreme Court rejected *Simmons*'s reasoning in *United States v. Owens* (1988) 484 U.S. 554. (*Cowan*, *supra*, 50 Cal.4th at p. 468.) As *Cowan* held:

> "[T]he high court has squarely rejected that contention, concluding that 'when a hearsay declarant is present at trial and subject to unrestricted cross-examination,' 'the traditional protections of the oath, cross-examination, and opportunity for the jury to observe the witness'[s] demeanor satisfy the constitutional requirements,' notwithstanding the witness's claimed memory loss about the facts related in the hearsay statement." (*Cowan*, *supra*, 50 Cal.4th at p. 468, quoting *United States v. Owens*, *supra*, 484 U.S. at pp. 559–560, first bracketed insertion added.)

While the People argue that *Simmons* is no longer good law after *Cowan*, *Simmons* addressed both compliance with Evidence Code section 1237 in addition to the confrontation clause issue. *Cowan* effectively overruled *Simmons*'s holding regarding the confrontation clause but did not address its conclusion that a witness could not attest to the truth of their prior statement for purposes of Evidence Code section 1237, subdivision (a)(3) if they had no memory of even making the statement. (*Cowan*, *supra*, 50 Cal.4th at p. 468.) In addition, the witness in *Cowan* was not entirely lacking memory of providing his prior statement, as is the case here, and testified that his motivation was to get out of jail. (*Id*. at p. 467.)

We conclude, however, that *Cowan* has undermined *Simmons*'s analysis of Evidence Code section 1237 as well. *Simmons* concluded that effective cross-examination of the witness's attestation to the truth of the prior statement is required by Evidence Code section 1237, subdivision (a)(3) and not possible where the witness cannot remember even making the prior statement. But *Cowan* rejected the conclusion that the witness's memory is necessary for effective cross-examination for purposes of the confrontation clause, and we conclude that this is equally true for determining the reliability of a witness's testimony that her prior statement is true for the purposes of Evidence Code section 1237. Therefore, we reject *Simmons*'s categorical conclusion that Evidence Code section 1237, subdivision (a)(3) can never be satisfied where the witness has no memory of making the prior statement.

Under both *Cowan* and *Cummings*, the trial court must determine whether "the declarant's 'testimony that [the] statement was true [is] reliable,' " in assessing the adequacy of the foundation for admission of a prior statement under Evidence Code section 1237. (*Cowan*, *supra*, 50 Cal.4th at p. 467, second bracketed insertion added, quoting *Cummings*, *supra*, 4 Cal.4th at pp. 1293–1294.) The witness's inability to recall their prior statement is one factor, but not dispositive of the reliability of their testimony. When a witness with limited memory testifies that they told the truth when making a prior statement, the trial court may determine the reliability of their belief based upon considerations other than the witness's memory. Neither *Cowan* nor *Cummings* held that the witness's memory of being truthful when making the prior statement was the only factor to be considered and, as we discussed above, the trial court's discretion to admit the statements in those cases was upheld based upon consideration of other factors as well.

Volonda testified that she believed she told the truth during her interview but did not remember making the statement to the detectives. The trial court properly considered her lack of memory in assessing the reliability of her belief that she told the truth.

However, when a witness is asked about their truthfulness on a particular occasion, the witness's response will also be based upon personal knowledge of whether they habitually tell the truth or lies. We disagree with *Simmons*'s conclusion that "[o]ne who has no knowledge as to the truth or falsity of a representation may honestly say it is either true or false to the best of his knowledge with neither rejoinder having any evidentiary value."[20] (*Simmons*, *supra*, 123 Cal.App.3d at p. 683.) Nothing in Evidence Code section 1237, *Cowan*, or *Cummings* limits the trial court's review of the reliability of the statement to only the witness's memory of making the statement, and the trial court properly should consider the witness's belief as one part of its analysis.

In this case, Volonda's belief as to the truth of her statement was supported by other factors. Volonda was questioned about specific statements she made in her interview and, though she did not remember making the statements, Volonda independently remembered the facts that she had relayed and attested to their truth. This provides a foundation for Volonda's conclusion that she told the truth in her prior interview as to the other portions of her statement describing events that she could not recall. Whereas in *Simmons*, the witness could not recall any of the events in his statement, making it, or any circumstance surrounding the statement, Volonda recalled some events described in her statement. (See *Cummings*, *supra*, 4 Cal.4th at p. 1294 [distinguishing *Simmons*, *supra*, 123 Cal.App.3d at pp. 682–683 on this basis].)

In addition, Volonda testified that she did not have a reason to lie when interviewed by the detectives. While she could not remember the interview or the conversation that occurred with defendant the day before the interview, Volonda testified

---

[20]     In *Simmons*, the witness signed a written statement that attested to its truth but could not remember signing it, making the statement, or the events it described. (*Simmons*, *supra*, 123 Cal.App.3d at p. 680.) However, we believe a witness is competent to testify as to whether they would have falsely attested to the truth of the statement based upon their own personal knowledge of their character. (Cf. Evid. Code, §§ 1100–1105 [evidence of character, habit, or custom].)

to events occurring a day and a half before the interview (her argument with defendant about her car key and the altercation between Denzel and defendant that resulted), providing sufficient memory and an adequate foundation for her claim that she had no reason to lie when interviewed by the detectives.

The trial court was also aware that Volonda was in ill health at the time of the interview but that, according to Detective Feola, she seemed alert, understood his questions, and spoke coherently. As defense counsel pointed out, Volonda was angry with defendant at the time of the statement and may have had a bias or motive to lie. The trial court heard argument, defendant did not object to admission of the statement as to this specific foundational requirement, and the court admitted the statement into evidence. The trial court's conclusion that Volonda testified truthfully and reliably when she said her statement to the detectives was true is supported by the record.

### 3. Any error in admitting Volonda's interview statement was harmless.

Even if the trial court erred in admitting Volonda's interview statement, defendant has failed to show that it is reasonably probable that he would have received a more favorable outcome absent the alleged error. (*People v. Watson* (1956) 46 Cal.2d 818, 836; see *People v. Parks* (1971) 4 Cal.3d 955, 961 [applying *Watson* harmless error analysis to erroneous admission of evidence pursuant to Evid. Code, § 1237].) This Court asks whether, " 'after examin[ing] the entire cause, including the evidence,' " it is "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson*, at p. 836.)

Defense counsel challenged the prosecution's evidence that defendant committed any crime and attacked Doneisha's credibility. In closing, defense counsel argued that Doneisha desired to remove defendant from Volonda's life to gain access to Volonda's house and vehicle and that Denzel was the aggressor in the altercation that resulted in his shooting. Defense counsel impeached Doneisha with her prior conviction resulting from

36.

criminal activities also involving Denzel, but Volonda's interview statement provided evidence that defendant told Volonda that her actions "gave [Denzel] a death wish," used by the prosecution as evidence that defendant threatened to kill Denzel. Therefore, defendant concludes that the jury would have rejected Doneisha's testimony that defendant was the aggressor and not acting in self-defense if Volonda's prior statement as to this conversation had not been admitted.

However, Doneisha's testimony against defendant was corroborated by more than Volonda's interview statement. First, Volonda testified that Doneisha drove her to the hospital, she argued with defendant, and she asked Denzel to retrieve her keys. This testimony corroborated Doneisha both as to the argument and Denzel's action of retrieving Volonda's keys from defendant at her behest. Volonda also testified that she and defendant had been fighting in the month she was hospitalized.

In addition to Volonda's testimony to events she did recall, the prosecution offered physical evidence and testimony that corroborated several aspects of Doneisha's testimony. Doneisha testified that on the evening before the assault, defendant called her once, then pocket-dialed her while expressing his desire to get a gun, and then left a long voicemail for her. In the voicemail, defendant referred to Doneisha as "a bitch" and the tone and tenor of defendant's voice on the recording corroborated Doneisha's testimony that defendant harbored animosity against her. Though not corroborating the content of the call, the prosecution offered cell phone records that corroborated Doneisha's testimony that she received calls from defendant.

Doneisha testified that she was home doing laundry and then fell asleep. Doneisha's cell phone records corroborated the time she arrived home, and a text to her sister corroborated that she was doing laundry. Testimony and photographic evidence showed that while being tended to at Castro's house, Denzel was wearing boxer briefs and a white T-shirt. These facts corroborated that Doneisha and Denzel were in bed at the time of the assault.

37.

Further, Doneisha testified that after defendant yelled and burst into Volonda's house, defendant stood at one end of the hallway near the front door, pointed the gun at Denzel's head, fired the gun, missed, and hit a cabinet that was just behind where Denzel was standing at the other end of the hallway. Testimony that the police found a bullet hole that entered the cabinet at a height two inches above Denzel's height and traveled through items inside the cabinet corroborated Doneisha's description of the shooting.

Doneisha testified that defendant shot Denzel, she called 911, and defendant continued to threaten them as they attempted to escape the house. Both an officer and Doneisha's neighbor testified that Denzel told them defendant had shot him. In the 911 recording, the 911 operator referred to Doneisha's prior call and Doneisha told the operator that defendant was threatening them from a bike as they walked down the street. This evidence corroborated Doneisha's testimony as to the circumstances of the shooting as well.

Doneisha's recorded statements to detectives just after the assault also corroborated her testimony as to defendant's responsibility for shooting Denzel and defendant's threats should they contact the police. While Doneisha testified inconsistently as to when defendant fired the first shot (while she was standing in the doorway before Denzel tried to hold the guest bedroom door closed or after Denzel entered the hallway a second time), a jury could reasonably ascribe this discrepancy to a memory lapse caused by the passage of time.

Given the entirety of the evidence, we cannot agree with defendant that the outcome of the trial would have been different if the trial court had excluded Volonda's interview statement that defendant said she had given Denzel "a death wish." Even if the trial court erred in admitting Volonda's statement, any such error was harmless.

## II. *Defendant's conviction of dissuading a witness as charged in count 7 is supported by sufficient evidence.*

Defendant argues the evidence was insufficient to prove that he intimidated Denzel as charged in count 7. We reject defendant's argument that his actions were only directed to intimidating Doneisha and not Denzel and conclude that the evidence is sufficient to support defendant's conviction of dissuading Denzel from reporting the assault to the police.

### A. Standard of Review and Law

In reviewing the sufficiency of evidence to support a conviction, we examine the entire record and draw all reasonable inferences therefrom in favor of the judgment to determine whether it discloses substantial credible evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Brooks* (2017) 3 Cal.5th 1, 57.) We do not redetermine the weight of the evidence or the credibility of witnesses. (*People v. Albillar* (2010) 51 Cal.4th 47, 60; *People v. Young* (2005) 34 Cal.4th 1149, 1181 ["Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact."].) We must accept logical inferences that the trier of fact might have drawn from the evidence even if we would have concluded otherwise. (*People v. Streeter* (2012) 54 Cal.4th 205, 241, disapproved on other grounds as stated in *People v. Harris* (2013) 57 Cal.4th 804, 834.) "If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*Albillar*, at p. 60.) "Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*Young*, at p. 1181.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

Section 136.1 establishes two forms of the "dissuading" offense. Dissuading a witness from testifying is proscribed by subdivision (a). Relevant to this case, subdivision (b)(1) criminalizes trying to dissuade a victim from reporting a crime. (§ 136.1, subds. (a), (b)(1).) "To prove a violation of section 136.1, subdivision (b)(1), the prosecution must show (1) the defendant has attempted to prevent or dissuade a person (2) who is a victim or witness to a crime (3) from making any report of his or her victimization to any peace officer or other designated officials." (*People v. Upsher* (2007) 155 Cal.App.4th 1311, 1320.) These offenses are felonies when the defendant's acts in contravention of section 136.1, subdivisions (a) or (b) are "accompanied by force or by an express or implied threat of force or violence, upon a witness or victim." (§ 136.1, subd. (c)(1).)

Criminal dissuasion may be inferred from the defendant's words or conduct; the defendant need not say, " ' "Don't testify," ' " or make an equivalent remark. (*People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1344.) As explained in *People v. Foster* (2007) 155 Cal.App.4th 331, in view of this provision, section 136.1 "neither restricts the means a defendant selects to commit the offense, nor does it require that [the] defendant personally deliver the message to the witness." (*Foster*, at p. 335.) A threat need not actually deter or reach the witness because the offense is committed when the defendant makes the attempt to dissuade the witness. (*Ibid.)*

## B.     Analysis

The prosecution asserted that defendant attempted to dissuade both Doneisha and Denzel from reporting defendant's crimes against them to the police. Defendant challenges the evidence that defendant dissuaded Denzel from reporting defendant's crimes to the police by threat or force. Based upon our review, we conclude there is ample evidence to support defendant's convictions under section 136.1.

"The crime of intimidating a witness requires proof that the defendant specifically intended to dissuade a [victim or] witness from testifying." (*People v. Young*, *supra*,

40.

34 Cal.4th at p. 1210.) "It is the combination of defendant's actions and words … that provides sufficient evidence that he intended to intimidate [Denzel] from [reporting defendant's crimes to the police]." (*Ibid*.) The trial evidence showed that Doneisha tried to contact the police on behalf of herself and Denzel at least two times before reaching the neighbor's residence and making the final call to 911.

According to Doneisha's testimony, the first attempt occurred after Denzel entered the hallway, returned to the guest bedroom, and attempted to hold the door closed to prevent defendant from entering. Denzel told Doneisha to call the police and defendant yelled, " 'Bitch, hang up the phone. You call the police, I'm gonna kill you and I'm gonna kill him too.' " Doneisha ended the call, scared that defendant would shoot them. Doneisha also provided this information to Detective Vaughn during her interview with the detectives. During her interview with Officer Moore at the scene, Doneisha also said that she attempted to contact the police, but defendant threatened to kill Denzel if she did, causing her to end the call. Denzel was with Doneisha during defendant's threats and would have heard them as well.

Doneisha testified that she ran into the primary bedroom where Denzel lay bleeding and called 911 again. She told the operator her name, address, and the nature of the emergency before defendant threatened her to hang up the phone. During her interview with Officer Moore, Doneisha said:

> "… I called 911 inside the house. [¶] … [¶] … When—when the shot went off. [¶] … [¶] … And he was like, 'if you get on that fucken phone, I'mma shot [*sic*] again.' So I had—already gave [the operator] the address and told her that he was shot. [¶] … [¶] … But I had to hang up. [¶] … [¶] … Because he was walking back towards the back and I didn't want him to shot [*sic*] again so I hung up."

Describing the call a second time, Doneisha said that after Denzel was shot, defendant ordered them from the house:

> "And I'm, like, '[defendant] we're going, like, please we're going.' And he was, like, 'If you call the fuckin' police' and I just hung up the phone

41.

like… [¶] … [¶] … Because he started walking back to see if I was on the phone. So I hung up the phone. I grabbed my back pack [*sic*] and I had slipped my pants on."

During her interview with the detectives, Doneisha described her second call to 911 after Denzel was shot. While Doneisha was trying to help Denzel leave the primary bedroom, defendant pointed the gun at both of them and told Denzel to get up or he would shoot Denzel again. Defendant told both of them to get out of the house. Doneisha stated:

"Um, [defendant] told me that if I didn't hurry—if I called the police he was gonna kill me. He said, 'If you call the police, bitch, I'm gonna—I'm gonna kill you, and I'm gonna shoot him again.'"

When defendant threatened to kill Doneisha if she called the police after Denzel was shot, Doneisha was sitting with Denzel, and Denzel would have heard defendant's threat.

Thereafter, as Doneisha helped Denzel walk down the street, Doneisha called 911. She testified that she told the operator she had just called. While on the call, defendant approached her on a bicycle, and she ended the call. He said, " 'I knew you would call the police.' " She denied using the cell phone. Doneisha's interview with Officer Moore describes defendant as saying, " '[Y]eah we gonna see—we gonna see who gonna be the real snitch—let's see if these police show up—you wanna fucken call the police.' " In the same interview, Doneisha explained:

"And I had already called [911] again. [¶] … [¶] … And so when he pulled up he was, like,—when I seen him on the bike I hurried up and hung up the phone again. [¶]… [¶] … And so he pulled up and he said, 'We're gonna see if you gonna be a snitch.' " Defendant also said, " 'We gonna see if you called the fuckin' police' " and " 'I bet you fucking called the police bitch.' "

Doneisha denied calling the police and begged defendant to leave. She feared that defendant would shoot them.

During her later interview with the detectives, Doneisha explained ending the 911 call when defendant approached on a bicycle: "Well this man is telling me he's gonna

42.

kill me if I call the police. Like I have to hang up. Like he can't see me on my phone." When defendant reached them, he said, " 'Yeah, we gonna see now. We gonna see who the snitch, bitch. You snitchin'? You callin' the fuckin' police? All right. We gonna see.' " Doneisha assured him that she did not call the police and defendant rode back down the street toward Volonda's house.

The 911 recording also evidenced defendant's threats to prevent Doneisha from contacting the police while walking from Volonda's house. Doneisha advised the operator that she was at the neighbor's house. When asked if she called previously, Doneisha responded, "I've been calling but I keep happen [*sic*] to hang up because this guy's chasing us down the street and he told me if I called the police …." Doneisha testified that defendant said he would shoot them if they called the police. Doneisha also said, "I tried to walk and get help because he keeps following us. [¶] … [¶] … Well he's been riding around on his bike saying that he was going to shoot if I called the police …."

Defendant's words and actions exhibited an intent that his crimes go unreported to the police. Both Doneisha and Denzel were victims and witnesses to the crimes, and defendant's intent would have been defeated had either victim contacted the police. Although defendant's words addressed Doneisha, Denzel was with Doneisha and heard them as well. Defendant's words conveyed to each victim defendant's intent to cause bodily injury if defendant's crimes were reported. A jury could reasonably infer that Denzel understood defendant's words to threaten injury to either Denzel or Doneisha even if Denzel were the one to contact the police, and that defendant's words indicated that he would injure either Doneisha or Denzel should either of them report his crimes to the police. We do not find it reasonable to believe, based upon defendant's words and actions, that defendant did not intend that his conduct similarly dissuade Denzel from reporting the crime. Defendant offers no case law to support his argument that defendant must personally address every victim or witness who is present for his words and actions to dissuade them from reporting his crimes to the police.

43.

Defendant argues that the prosecutor offered no evidence that Denzel was trying to call the police or that defendant acted to prevent him from doing so. However, defendant fails to provide any legal authority that the act of dissuading requires the victim or witness to be in the act of making the report. In addition, a jury could reasonably infer that defendant was trying to dissuade Denzel and Doneisha from communicating with the police at times subsequent to the 911 calls. While it is likely that defendant concluded Denzel was in no condition to use a phone to call the police, a jury could reasonably infer that defendant's words and actions were intended to dissuade Denzel from conveying the facts of the assault to the police at any time in the future or cooperating in any subsequent investigation. Even though Denzel was not then notifying the police of what had transpired, a jury could reasonably infer that defendant's words and actions were intended to, and capable of, affecting whether Denzel would provide information of defendant's crimes if contacted by the police in the future. Thus, jurors could have reasonably inferred that defendant intended to dissuade Denzel from providing any information to the police concerning defendant's crimes.[21]

We conclude that the evidence was sufficient to support defendant's conviction of witness intimidation as charged in count 7.

### III. *Defendant's prison term exceeding his life span does not constitute cruel and unusual punishment under the Eighth Amendment.*

Defendant contends that his 302 year-to-life sentence constitutes cruel and unusual punishment. He argues that his sentence, in reality, is a life sentence without the possibility of parole and "[c]alling a sentence something 'to life' " "shocks the conscience" by "creat[ing] a legal fiction" that "will result in a defendant dying in prison before he becomes eligible to even seek parole."

---

[21] Defendant argues in his reply brief that the conduct underlying count 7 is "based on the moment when Doneisha and [Denzel] were walking down the street," when defendant said, " 'I knew you would call the police.' " Defendant's argument is unsupported by citation to case law or the record in this case, and we reject it.

Acknowledging that his cruel and unusual argument was not raised in the trial court, defendant argues that it is both a pure legal question and not subject to forfeiture as defendant's sentence is not lawful. The People respond that defendant's claim is forfeited and, if not, defendant's failure to engage in a proportionality analysis should be taken as a concession that his constitutional claim lacks merit. We conclude defendant has forfeited this issue by failing to raise it below and, even if it had been preserved, the constitutional claim is meritless.

### A. Defendant Has Forfeited This Claim

"Whether a punishment is cruel and/or unusual is a question of law subject to our independent review …." (*People v. Palafox* (2014) 231 Cal.App.4th 68, 82.) As defendant concedes, however, he did not raise this issue in the trial court. California law is clear that by failing to raise the issue below, he has forfeited the claim. (*People v. Speight* (2014) 227 Cal.App.4th 1229, 1247–1248, and cases therein cited.)

Defendant argues that his claim is cognizable on appeal because it involves a "pure question of law." We are not persuaded. "Cruel and unusual punishment arguments, under the federal or California tests, require examination of the offense and the offender." (*People v. Norman* (2003) 109 Cal.App.4th 221, 229; accord, *People v. Speight*, *supra*, 227 Cal.App.4th at p. 1247.) The court begins by comparing the gravity of the offense and severity of the sentence and, if this supports an inference of gross proportionality, the court should then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions. (*In re Coley* (2012) 55 Cal.4th 524, 538, 540, 542.)

Defendant argues that forfeiture does not apply to "a sentence … which 'could not lawfully be imposed under any circumstances in the particular case,' " citing *People v. Nasalga*, (1996) 12 Cal.4th 784, 789. *Nasalga* has no application to defendant's argument. Under *Nasalga*, "[a] sentence is unauthorized when it could not lawfully be

45.

imposed under any circumstance in the particular case: '[L]egal error resulting in an unauthorized sentence commonly occurs where the court violates mandatory provisions governing the length of confinement.' " (*Id.* at p. 789, fn. 4, first bracketed insertion added, quoting *People v. Scott* (1994) 9 Cal.4th 331, 354.)  Defendant was not sentenced in excess of the term authorized by law.  Therefore, *Nasalga* does not save his claim from forfeiture.

## B.  Defendant's Sentence Is Not Unconstitutional

Even if we had not concluded defendant forfeited this claim, we would reject the claim on the merits.  Rather than rely upon the proportionality analysis required by *In re Coley*, *supra*, 55 Cal.4th at page 538, defendant relies upon Associate Supreme Court Justice Stanley Mosk's concurring opinion in *People v. Deloza* (1998) 18 Cal.4th 585, noting that a sentence exceeding a human life span can serve no rational penological purpose and is inherently cruel and unusual.  (See *id.* at pp. 600–601 (conc. opn. of Mosk, J.), citing *Furman v. Georgia* (1972) 408 U.S. 238, 331 (conc. opn. of Marshall, J.).)  Justice Mosk's concurring opinion in *Deloza* was not the view of the majority of our Supreme Court and therefore has no controlling weight or precedential value.  (*People v. Ceballos* (1974) 12 Cal.3d 470, 483; *People v. Byrd* (2001) 89 Cal.App.4th 1373, 1383 (*Byrd*).)

Defendant's argument, relying on *Deloza*'s concurrence, has also been rejected by other courts.  (*People v. Haller* (2009) 174 Cal.App.4th 1080, 1087–1092 [upholding sentence of 78 years to life even though no eligibility for parole until defendant would be 119 years old]; *People v. Retanan* (2007) 154 Cal.App.4th 1219, 1222, 1231 [upholding sentence of 135 years to life for 16 felony offenses arising from molestation of four children]; *Byrd*, *supra*, 89 Cal.App.4th at pp. 1375–1376, 1383 [upholding sentence of 115 years plus 444 years to life for 12 counts of robbery plus mayhem, and attempted premeditated murder, with personal discharge of firearm and three priors].)

Furthermore, defendant's sentence actually serves valid penological goals, including vindication of society's sense of justice, protecting society from criminal harms, and deterring criminal behavior. (See *People v. Mesce* (1997) 52 Cal.App.4th 618, 632 [the "classic concerns of sentencing" are "retribution, deterrence, and incapacitation"]; see also *In re Nuñez* (2009) 173 Cal.App.4th 709, 730 ["Valid penological goals include retribution, incapacitation, rehabilitation, and deterrence."]; *People v. Warner* (1978) 20 Cal.3d 678, 689 ["The paramount concern in sentencing must be the protection of society."].)

As explained in *Byrd*, "it is immaterial that defendant cannot serve his sentence during his lifetime. In practical effect, he is in no different position than a defendant who has received a sentence of life without possibility of parole: he will be in prison all his life. However, even imposition of a sentence of life without possibility of parole in an appropriate case does not constitute cruel or unusual punishment under either our state Constitution [citation] or the federal Constitution. [Citation.] [¶] Moreover ..., a sentence such as the one imposed in this case serves valid penological purposes: it unmistakably reflects society's condemnation of defendant's conduct and it provides a strong psychological deterrent to those who would consider engaging in that sort of conduct in the future." (*Byrd*, *supra*, 89 Cal.App.4th at p. 1383.)

Although defendant does not argue disproportionality, we note that sentences exceeding human life expectancy, like defendant's, have been repeatedly upheld against constitutional challenge as proportional. (See, e.g., *People v. Cartwright* (1995) 39 Cal.App.4th 1123, 1132, 1139–1141 [affirming sentence of 375 years to life plus 53 years for sexual assault on three women pursuant to "Three Strikes Law" after engaging in a proportionality analysis]; *People v. Wallace* (1993) 14 Cal.App.4th 651, 666–667 [affirming sentence of 283 years plus eight months for multiple sex offenses after engaging in a proportionality analysis]; *People v. Bestelmeyer* (1985)

166 Cal.App.3d 520, 532 [affirming sentence of 129 years for sexual assault on children after engaging in a proportionality analysis].)

Defendant was convicted for attempting to murder Denzel and shooting him three times. He first entered the criminal justice system in 1977 as a juvenile. Between 1980 and 1995, defendant was convicted of nine felony offenses, including grand theft, burglary, resisting a police officer, transportation or sale of a controlled substance, oral copulation with a minor, assault with a deadly weapon, and kidnapping. For these crimes, defendant was sentenced to a total of 48 years in prison. Given this record, the sentence that defendant received in the instant case furthered acceptable penological goals of retribution, incapacitation, and deterrence and, accordingly, was not excessive. We therefore conclude that defendant's punishment was not cruel or unusual under either the state or federal Constitution.

## IV. The trial court erred in calculating defendant's presentence custody credits by not awarding local custody credits from the time the medical director certified defendant's competency while still at the state hospital.

Defendant initially argued that the trial court erred in calculating his presentence custody credits by five days. The People responded that defendant's argument was erroneous in attempting to obtain local conduct credit for time defendant spent in the state hospital while having his competency restored. Defendant replied, acknowledging his error and argues that he is entitled to one additional day of local conduct credit as he is entitled to local conduct credit for time he spent in the state hospital once his competency was restored and while awaiting transport to the local jail. We conclude defendant is entitled to one additional day of local conduct credit.

### A. Background

Relying on the probation report, the trial court awarded defendant 1,019 days of actual credit and 147 days of local conduct credit for a total of 1,166 days of presentence custody credits. The trial court found defendant incompetent to stand trial and committed

him to the state hospital on November 15, 2016. Between March 15, 2017, and April 17, 2017, defendant was at the state hospital having his competency restored. The medical director of the state hospital certified defendant was competent on April 11, 2017. Defendant returned to the local jail on April 18, 2017. The trial court did not award conduct credit for any time between March 15, 2017, and April 18, 2017.

## B.     Standard of Review

We independently review whether a trial court has correctly awarded custody credits. (*People v. Arevalo* (2018) 20 Cal.App.5th 821, 827; *People v. Anaya* (2007) 158 Cal.App.4th 608, 611.)[22]

## C.     Law and Analysis

A defendant accrues actual custody credits pursuant to section 2900.5, and conduct credits pursuant to section 4019,[23] for time spent in custody prior to sentencing. (*People v. Arevalo*, *supra*, 20 Cal.App.5th at p. 827.) Actual custody credits are calculated by adding together "all days of custody" the defendant has served. (§ 2900.5, subd. (a).) In contrast, under section 4019, a defendant can earn two days of conduct credit for every two days actually served. (§ 4019, subds. (b), (c), (f).) However, a defendant convicted of a violent felony under section 667.5 "cannot earn good behavior credits under section 4019 exceeding 15 percent of the actual time of confinement in a local facility 'prior to placement in the custody of the Director [of Corrections and Rehabilitation].'" (*People v. Buckhalter* (2001) 26 Cal.4th 20, 31–32, quoting § 2933.1, subd. (c).) Defendants are not entitled to conduct credits for the time spent at a state hospital while incompetent because sentencing credit for good behavior is inconsistent

---

[22]     While section 1237.1 requires a defendant to present a presentence custody credit claim to the trial court before raising the issue on appeal, this limitation only applies where the issue is the sole issue raised in the appeal. (*People v. Acosta* (1996) 48 Cal.App.4th 411, 420–428.) Judicial economy supports our consideration of the claim. (*Id.* at p. 427.)

[23]     Defendant was sentenced under former section 4019 (added by Stats. 2018, ch. 1008, § 5, eff. Jan. 1, 2019, through Dec. 31, 2019).

with the therapeutic goals of treating a defendant to restore him to competency. (*People v. Bryant* (2009) 174 Cal.App.4th 175, 182 (*Bryant*); *People v. Waterman* (1986) 42 Cal.3d 565, 570; *People v. Deletto* (1983) 147 Cal.App.3d 458, 481.)

"However, it has been held that equal protection requires application of section 4019 credits to presentence confinement in a state facility if the circumstances of the confinement are essentially penal." (*People v. Buckhalter*, *supra*, 26 Cal.4th at p. 30, fn. 6, citing *People v. Guzman* (1995) 40 Cal.App.4th 691, 693–695 [person diverted, prior to sentencing, for treatment at California Rehabilitation Center (CRC), but later excluded from CRC as unsuitable, is entitled to § 4019 credits while thereafter still confined at CRC pending sentencing] & *People v. Nubla* (1999) 74 Cal.App.4th 719, 731.)

In *Bryant*, staff members at a state hospital signed a report recommending that Bryant be returned to the superior court because he was competent to stand trial. (*Bryant*, *supra*, 174 Cal.App.4th at p. 184.) However, Bryant was not returned to local custody as his certification of mental competency was not executed until two months later. (*Ibid.*) Bryant received conduct credits from the date of the medical certification but claimed entitlement to conduct credits from the time of the report. (*Id.* at p. 182.) Relying on *Buckhalter*, *Guzman*, and *Nubla*, the *Bryant* court held that equal protection principles require awarding conduct credits for time a defendant spends at a state hospital after being found competent but prior to being returned to local custody. (*Bryant*, at pp. 182–184.) While recognizing that a defendant may not be entitled to such in all circumstances, the court held, "[W]hen the uncontradicted evidence demonstrates the accused's competency was unquestionably regained as of a date certain, … the defendant is entitled to section 4019 conduct credits even though the … certification has not been mailed to the trial court." (*Id.* at p. 184.)

Therefore, we conclude that defendant commenced accruing local conduct credit on April 11, 2017, the date that the medical director signed defendant's certificate of

mental competency.  Accordingly, we conclude the judgment should be modified to award defendant additional presentence custody credit for the period from April 11, 2017, through April 17, 2017.

## **DISPOSITION**

The judgment is modified to award defendant additional local conduct credit for the period from April 11, 2017, through April 17, 2017.  Upon issuance of the remittitur, the trial court shall recompute the local conduct credit award and the clerk shall prepare an amended abstract of judgment and forward it to the Department of Corrections and Rehabilitation.

In all other respects, the judgment is affirmed.


HILL, P. J.

WE CONCUR:


FRANSON, J.


PEÑA, J.

51.